

**FILED**

SEP 13 2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CAMERON L. REGAN and LOUIS IMPAGLIAZZO, | ) ) ) ) | **24cv8430** |
| Plaintiffs, | ) | **Judge Gottschall** |
| v. | ) ) | **Magistrate Judge Gilbert** |
|  | ) | **RANDOM/CAT 2** |
| CHRISTOPHER F. ADOLF, VILLAGE OF LAKEMOOR, FRANCIS JOSEPH Y. REYES, and SDR GARAGE INC., | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs Cameron L. Regan and Louis Impagliazzo bring this Complaint against Defendants Christopher F. Adolf, Village of Lakemoor, Francis Joseph Y. Reyes, and SDR Garage Inc., and state as follows:

## NATURE OF THE CASE

1.   This case involves a vehicle that was improperly fixed and evidence that was properly fixed.

2.   Plaintiffs Cameron L. Regan and Louis Impagliazzo entrusted their rare 1994 Mazda Autozam AZ-1 ("Mazda") to SDR Garage for repair, relying on owner Francis Reyes's claims of expertise. After agreeing to a reasonable $3,000 fee plus parts, Plaintiffs encountered shoddy workmanship, misdiagnoses, and repeated delays. Excited to finally drive their Mazda and put the ordeal behind them, Louis and Cameron were blindsided by an invoice exceeding $10,000—more than triple the agreed price—alongside demands for immediate payment. Under duress, Cameron issued the payment and signed a waiver to retrieve the vehicle, only to discover that Mr. Reyes had lied about the adequacy of repairs—the car was in worse condition than when it was originally delivered to the garage.

1

3.      Upon realizing they had been defrauded, Louis and Cameron attempted to resolve the matter civilly. In response, Mr. Reyes leveraged law enforcement as his private collection agency by filing a misleading "bad check" report with Lakemoor Police Officer Christopher Adolf. When Adolf's investigation uncovered exculpatory evidence, rather than accept Cameron's innocence, he altered the timeline to sustain his theory of the case. Based on Adolf's fabricated evidence and Mr. Reyes's nonsensical version of events, Cameron was wrongfully arrested and maliciously prosecuted on a felony deceptive practices charge. For nearly eighteen months, Mr. Reyes insisted on the continuation of Cameron's prosecution, only relenting once he had successfully extorted a dubious debt from Louis and Cameron.

4.      This action is brought pursuant to 42 U.S.C. § 1983 to vindicate the violation of Cameron's constitutional rights. Supplemental claims are also brought by Louis and Cameron to redress Mr. Reyes's intentional infliction of emotional distress and perversion of the criminal process for personal gain.

## PARTIES

5.      Plaintiff Cameron L. Regan ("Cameron") is a citizen of the State of Illinois and a resident of Cook County, Illinois.

6.      Plaintiff Louis Impagliazzo ("Louis") is a citizen of the State of Illinois and a resident of Cook County, Illinois.

7.      Defendant Christopher F. Adolf ("Adolf" or "Officer Adolf") is a citizen of the State of Illinois, a resident of Lake County, Illinois, and a police officer with the Lakemoor Police Department. Adolf is sued in his individual capacity for actions taken under color of law.

8.      Defendant Village of Lakemoor ("the Village") is an Illinois municipal corporation with its principal office in Lake County, Illinois. The Village employed Officer Adolf during the relevant period.

2

9.      Defendant Francis Joseph Y. Reyes ("Reyes") is the principal of SDR Garage Inc., a citizen of the State of Illinois, and a resident of Lake County, Illinois.

10.     Defendant SDR Garage Inc. ("SDR Garage") is an Illinois corporation which maintains its principal place of business at 538 Herbert Road Unit 9, Lakemoor, McHenry County, Illinois 60651. SDR Garage operates an eponymous automotive repair facility and used car dealership at its principal place of business.

## JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 based on 42 U.S.C. § 1983 claims. This Court has supplemental jurisdiction over Illinois state law claims pursuant to 28 U.S.C. § 1367.

12.     This Court has general jurisdiction over the Village because the Village is an Illinois corporation.

13.     This Court has jurisdiction over Adolf because his domicile is in Lake County.

14.     This Court has general jurisdiction over SDR Garage because SDR Garage is an Illinois corporation.

15.     This Court has jurisdiction over Reyes because his domicile is in Lake County.

16.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 because, *inter alia*, the Village's principal office is located in Lake County.

## ALLEGATIONS

### A. Louis and Cameron brought their vehicle to SDR Garage for a relatively uncomplicated engine repair that they had the means to afford.

17.     From late March to early April 2022, after their Mazda had experienced a blown head gasket, Louis and Cameron took part in multiple phone calls with Reyes to discuss the prospect of SDR Garage repairing the Mazda's engine.

3

18.     During those preliminary conversations, Reyes represented to Louis and Cameron that he was familiar with the make and model of the Mazda and that he was uniquely qualified to perform restoration and repair work on its engine. Reyes emphasized that he had attended four years of automotive school and was a licensed, certified mechanic with specialized training in engine repair.

19.     On April 11, 2022, Louis and Cameron had their Mazda towed from their residence in Chicago to SDR Garage's shop. When they dropped the Mazda off at SDR Garage's shop, Cameron's PNC checking account balance was $308,128.29.

20.     In mid-May 2022, Reyes called Cameron and offered to fully repair and restore the Mazda's engine for $3,000 as long as Louis and Cameron would pay for and deliver approximately $2,000 worth of necessary engine components. Louis and Cameron agreed to Reyes' verbal offer—they promised to pay $3,000 and to provide all necessary parts in exchange for SDR Garage's promise to fully repair and restore their Mazda's engine.

21.     Although Reyes represented that the Mazda's repair would only take two to three weeks of part-time labor, SDR Garage had the Mazda in its possession for nearly six months. During much of that period, SDR Garage prioritized the repair of other vehicles and Reyes repeatedly apologized that he was "swamped with work." Once work started on the Mazda in earnest, SDR Garage's incompetence resulted in further delay after its employees created an electrical fault and misdiagnosed a fuel delivery issue.

**B.  Reyes utilized high-pressure tactics and fraud to induce Cameron to issue a check for an invoice that was more than triple the agreed price.**

22.     On September 7, 2022, Reyes sent a text message to Cameron that said, "We got her running!!! . . . will be finishing her up this week." On September 19, 2022, Reyes told Louis and Cameron that the Mazda "runs amazing." Over the following three days, Reyes sent a series of text messages to Louis and Cameron indicating that the Mazda had no material

issues and was ready to pick up. During those conversations, Reyes never mentioned any reservations he had about the Mazda's mechanical state.

23.     Louis and Cameron justifiably relied on all of Reyes's representations and traveled from Chicago to Lakemoor to retrieve their Mazda on September 23, 2022. When they arrived, at approximately 2:10 PM, Reyes was waiting with the Mazda—parked, with its engine off—in front of SDR Garage's shop. Cameron requested a test drive, but Reyes insisted that they "take care of some paperwork first." Cameron reiterated that he wanted to inspect the Mazda first, but Reyes refused and repeated that it was "running great."

24.     Reyes ushered Louis and Cameron into his office and presented them with an invoice from SDR Garage for $10,322.24. Upon seeing the bill, Louis was so incensed that he left Reyes's office in protest. Cameron remained in the office and verbally objected to the total. Despite his customers' outrage that the invoice was more than triple the agreed price, Reyes stated that SDR Garage was unwilling to negotiate. Along with the invoice, Reyes presented Cameron with a waiver purporting to release SDR Garage from all liability.

25.     Reyes told Cameron that he would not allow him to take possession of the Mazda until he paid the inflated bill and signed the release. When Cameron remained firm in his protest of the bill, Reyes said that SDR Garage had encountered some "unexpected trouble" performing repairs and that he was "just trying to run a business." Reyes told Cameron how much "care he put into [the Mazda]" and that he voluntarily completed extra maintenance tasks so that the Mazda would run at "peak performance." Reyes assured Cameron that he would be amazed when he drove the car and that it would "feel like he was driving a brand new car off the lot."

26.     Cameron examined the itemization on the invoice and told Reyes that it seemed like most of the extra work was done due to the issues that SDR Garage had caused. Cameron

reminded Reyes that he had been instructed not to do any extra work without seeking approval and that SDR Garage had never sought approval to exceed the agreed price.

27.     Reyes warned Cameron that if he protested any further, SDR Garage would immediately sell the Mazda to recover the amount of the bill. He vowed that unless the entire $10,322.24 invoice were paid, Cameron "would never see [his] Mazda again."

28.     Cameron perceived Reyes's threats as imminent and credible, and wished to avoid any possibility of the permanent loss of his rare Mazda. After leaving the office to consult with Louis, Cameron signed the waiver, issued SDR Garage a check for $10,322.24, gave Reyes a copy of his ID, and posed for a picture with the check at Reyes's request.

29.     Louis and Cameron begrudgingly submitted payment for an inflated invoice because they believed that it was the only way to avoid the loss of their vehicle. They issued the check under the assumption that Reyes had truthfully represented the Mazda's condition.

30.     When Cameron issued the $10,322.24 check at approximately 2:45 PM on September 23, 2022, his corresponding PNC checking account had a balance of $49,454.93 and he had roughly $350,000 in cash equivalents.

### C. Upon driving their Mazda for the first time in six months, Louis and Cameron immediately realized that Reyes had defrauded them.

31.     Louis and Cameron quickly realized that Reyes had grossly misrepresented the Mazda's mechanical, cosmetic, and structural condition. The Mazda's engine—the primary focus of SDR Garage's work and the only part of the vehicle that had an issue at the start of service—ran rougher than ever, consistently backfired, and produced a strong smell of burnt coolant. The Mazda's exhaust emitted a thick black smoke. The Mazda was unable to accelerate when Cameron depressed its throttle more than a quarter of the way down. Multiple hard-to-replace buttons and gauges on the dashboard had been broken and

6

haphazardly glued back in place by SDR Garage's employees. There was also exterior damage to the underside of the vehicle.

32.     Given the Mazda's condition, Louis and Cameron suddenly realized why Reyes had been so insistent on requiring a signed waiver and a check before he would let them drive the car—Reyes had known that the Mazda was in such an obvious state of disrepair that even a non-mechanic would have noticed its issues upon driving it.

33.     Louis and Cameron immediately returned to SDR Garage's shop and offered to negotiate with SDR Garage in good faith once they could commission an inspection from a third-party mechanic. Louis told Reyes that in the meantime, a stop payment would be placed on the check since Reyes had misrepresented the condition of the car.

34.     Reyes denied all allegations, blamed the Mazda's turbocharger for its issues, and reminded Cameron that he had "just signed a waiver."

35.     Cameron responded by telling Reyes not to cash his check.

36.     Reyes said that if Louis and Cameron refused to pay the full invoice, he would contact the police and "report them for theft." A shouting match between Louis and Reyes immediately ensued after Reyes's "theft" comment. Cameron sensed that any further discussion would be futile and repeated that he and Louis would determine an amount to pay SDR Garage for the repairs once they had another mechanic inspect the Mazda.

37.     On the ride home, Louis consulted with consumer protection attorneys in an attempt to determine the most prudent legal course of action. Those attorneys agreed that it would be best if SDR Garage were prevented from cashing the check. If that were not possible, the attorneys suggested that Louis and Cameron file a small claims suit.

38.     Cameron's checking account balance was then transferred to his savings account in case payment could not be stopped in time to prevent the check's clearance.

7

39.    When Louis and Cameron arrived home, Cameron sent Reyes a text message memorializing the conversation that took place earlier that day at SDR Garage's shop. Cameron noted that "over $10,000 and 6 months later, [the Mazda] [was running] worse than it ever did." Cameron repeated that he would "let [Reyes] know when [he and Louis] decide how [they] want to move forward."

40.    Reyes replied, "If you choose to believe me or not that's on you . . . anything I say you just won't believe." Reyes then acknowledged Cameron's final statement by saying, "just [let me know] what you guys [want to] do moving forward."

41.    Based on the in-person conversation earlier that day, it was clear to all parties that when Cameron repeated that he and Louis would "decide how [they] want to move forward," he meant that they would decide how much to pay SDR Garage for services as soon as they were able to have a third-party mechanic inspect the Mazda.

42.    Reyes continued to insist that the Mazda was "running great" until September 25, 2022, when Cameron sent Reyes a video depicting the Mazda's coolant tank and its engine running. In response, Reyes admitted that "there is an issue with the engine" and told Cameron "not to run it anymore."

43.    Once Reyes confirmed that Cameron's check did not clear, he directed an agent to travel to Chicago to attempt an illegal self-help repossession of the Mazda. At approximately 12:05 PM on September 27, 2022, a man with a clipboard entered the alley behind Louis and Cameron's residence and looked around the parking area. The man appeared frustrated while searching, and he left empty-handed minutes later.

44.    About ten minutes after the man left, Reyes sent Cameron an unprompted text message that said, "I understand there is an issue with the engine . . . but . . . there are [sic] no warranty on this job since parts was [sic] provided by you." Though Reyes acknowledged

8

that SDR Garage's repairs were faulty, he demanded that Cameron pay SDR Garage the full amount of the disputed invoice.

### D. After Reyes's demands for full payment of the unconscionable bill were unfruitful, he contacted the police for their assistance in the civil dispute.

45. When Cameron refused to pay, Reyes contacted the Lakemoor Police Department.

46. In his conversations with the police, Reyes omitted facts that would have made it obvious that the dispute was not a criminal matter, including:

    a. That SDR Garage had exceeded the agreed price of $3,000.

    b. That Louis and Cameron had given, and SDR Garage had retained, valuable consideration at the start of the contract, including roughly $2,000 worth of parts.

    c. That Cameron had told him not to cash the check.

    d. That he had demanded payment of the invoice before allowing Louis or Cameron to inspect or drive the Mazda.

    e. That he had threatened to sell the Mazda if the invoice was not promptly paid.

    f. That SDR Garage had invoiced Louis and Cameron for unauthorized work.

    g. That he had materially misrepresented the condition of the Mazda.

    h. That the Mazda had critical engine, exhaust smoke, and fuel delivery issues that had not been present prior to SDR Garage's work.

    i. That he had recently admitted to Cameron in writing that there was a problem with the Mazda's engine after SDR Garage's work.

47. In his report to Officer Adolf, Reyes falsely stated that "he had already told Cameron that the vehicle would not be at 100% unless he purchased other parts."

48. In fact, Reyes had told Cameron that the Mazda had a "slight hesitation," but Reyes had stressed that it would go away on its own, "once [the Mazda] burned off its old fuel."

49.     Reyes candidly admitted to Officer Adolf that he "ultimately just wanted the money owed for the work provided."

50.     Adolf told Reyes not to accept partial payment from Cameron. According to Adolf, if Reyes accepted partial payment from Cameron, the case would "become civil."

51.     Adolf called Cameron and left a voicemail. In the voicemail, Adolf did not ask for Cameron's side of the story. Instead, Adolf told Cameron that he had "until October 7 to pay the debt in full to SDR Garage or else a warrant would be issued for his arrest."

52.     Adolf then mailed Cameron a form letter on Lakemoor Police Department letterhead that echoed the voicemail. The letter, dated September 30, 2022, demanded that Cameron make "payment [to SDR Garage] within seven working days." It concluded by advising Cameron to "avoid the embarrassment and inconvenience of being arrested by complying with [the] notice and notifying [Officer Adolf] that [Cameron's] debt has been satisfied."

53.     Cameron retained an attorney, Jason Dreifuss, and placed $10,322.24, the full amount of the disputed invoice, in an escrow account with him.

54.     Mr. Dreifuss subsequently called Adolf, told him that the case was a "civil dispute over poor workmanship," and offered to send copies of Cameron's bank statements.

55.     During that conversation, Adolf seemed more interested in recovering the alleged debt than examining Cameron's exculpatory evidence. He said, "Francis [Reyes] only wants to be paid the money owed and that if that happens, then [the] case 'becomes civil.'"

56.     On October 5, 2022, Adolf paid Reyes an in-person visit. Adolf told Reyes that "if nothing is done to [Reyes's] satisfaction in regards [sic] to getting paid by the end of the week, [he] would continue with [the] case" against Cameron.

57.     On October 19, 2022, Reyes sent Cameron a text message indicating that he would be redepositing the check on October 20, 2022.

58.     Cameron replied, "A stop payment was put on the check. As you are aware, the issue here is not due to a lack of funds, it's in the work I hired you for. I am working on finding someone to give a second opinion and an estimate . . . I transferred the $10,322.24 into an escrow account held by my lawyer where it will remain pending resolution of this dispute."

59.     Reyes never responded to or otherwise addressed Cameron's text message.

60.     Reyes reattempted to cash the check, and it was returned marked "stop payment."

**E.  When Officer Adolf's investigation revealed exculpatory information, he shifted the date of the check's issuance to fit his theory of the case.**

61.     On November 7, 2022, Adolf received Cameron's checking account statement from PNC Bank pursuant to a subpoena.

62.     Although both Reyes and Mr. Dreifuss had told Adolf that Cameron had issued the check on September 23, 2022 at 2:50 PM, Adolf wrote in his report that the incident had occurred "from September 26, 2022 at 2:50 PM to September 26, 2022 at 2:50 PM."

63.     Adolf's report on November 7, 2022 falsely stated that "Cameron only had $164.51 balance in his checking account when he wrote the check for $10,322.24 to SDR Garage."

64.     On September 23, 2022 at 2:50 PM, Cameron had $49,454.93 in his PNC checking account. On September 26, 2022 at 2:50 PM, Cameron had $164.51 in his PNC checking account. By writing "September 26" instead of "September 23," Adolf created the appearance that Cameron had withdrawn funds from his checking account before traveling to SDR Garage's shop to retrieve his Mazda.

65.     When Adolf met with ASA Maria Marek in the McHenry County State's Attorney's Office, he again falsely stated that Cameron's PNC checking account balance had been $164.51 at the moment that Cameron had issued the check to SDR Garage.

66.     ASA Marek told Adolf that she wanted to see if Cameron's PNC checking account had ever had enough to cover the $10,322.24 check, indicating that the information was material to her charging decision.

67.     Adolf did not tell ASA Marek that, in fact, Cameron's PNC checking account had contained $49,454.93 at the precise moment that he had issued the check.

68.     Around the same time, Cameron received a letter via first-class mail from attorney Guy Youman. Mr. Youman stated that he had been retained by SDR Garage and that Cameron had 30 days to send Mr. Youman $10,346.24. Mr. Youman warned Cameron that "[his] failure to do so [would] cause [Rupp & Youman] to file a civil action against [him]."

69.     Cameron told his attorney about the letter. During a call with Adolf on December 3, 2022, Mr. Dreifuss informed Adolf that Reyes had obtained a civil attorney. Adolf was surprised. He called Reyes and asked him "if he wanted [the] case to continue as criminal or if he now wanted to pursue [the] matter civilly since he had an attorney send a notice to Cameron." Reyes said that he would "talk to his wife . . . and email [Adolf] his decision."

70.     On information and belief, at some point over the following two weeks, Reyes instructed Adolf to continue his efforts to pursue criminal charges against Cameron.

71.     On February 6, 2023, Adolf's subpoena yielded additional documents from PNC Bank. The supplementary material underscored that Cameron's account had been sufficient when he had issued the check and showed that Cameron had nearly always maintained a six-figure checking account balance during the months preceding the date in question.

72.     Two days later, Adolf met with ASA Sophia Dinkel to present the case to her. Although Adolf had reviewed Cameron's bank documents multiple times, he continued to falsely represent that Cameron had issued the check on September 26, 2022.

73.     On information and belief, ASA Dinkel and ASA Hunter Jones relied on Adolf's misrepresentations when they decided to charge Cameron on February 14, 2023.

74.    On February 15, 2023, Adolf, acting under color of law and within the scope of his employment as a Lakemoor Police Officer, filed a criminal complaint in McHenry County.

75.    In that complaint, Adolf falsely stated yet again that Cameron had issued the check on September 26, 2022.

76.    Adolf falsely alleged that "Cameron knowingly did not have sufficient funds in his checking account to cover the check amount when issued to SDR Garage."

77.    That statement is necessarily false because Cameron could not have knowingly done something that he did not do. Cameron indisputably had $49,454.93, which is greater than $10,322.24, in his PNC checking account when he issued the check to SDR Garage.

78.    At the time Adolf swore out the complaint, he also knew, based on the concurrence between the accounts of Cameron's attorney and Reyes in certain respects, the following undisputed facts:

   a.  Cameron issued the check before he had an opportunity to test drive the Mazda.

   b.  Cameron's check was issued in payment of the debt that had been created by SDR Garage's supposed repair work—it did not induce SDR Garage to perform any work.

   c.  Cameron gave Reyes a valid Illinois driver's license as photo identification and allowed Reyes to photograph him holding the check.

   d.  Cameron drove the Mazda, noticed issues, and immediately returned to SDR Garage to complain about the mechanical state of the Mazda.

   e.  Cameron honestly believed that SDR Garage had caused the issues.

   f.  There were indeed mechanical issues with the Mazda.

79.    On the basis of Adolf's materially false criminal complaint, McHenry County Associate Judge Joel D. Berg issued a warrant for Cameron's arrest.

80.    Cameron received a call from his attorney informing him that a warrant had been issued for his arrest. Since Cameron had expected to be cleared of any wrongdoing, the

news came as a shock. Cameron had never been arrested or charged with any crime. Suddenly, he was faced with a pending felony charge and the immense pressure of proving his innocence. Cameron was mentally and emotionally overwhelmed by the news—as a result, he spent most of the next few months in a deep depression, unhealthily lost 40 pounds, and struggled to keep up with responsibilities.

81.     On February 17, 2023, Cameron was arrested in McHenry County on the warrant.

82.     Cameron was fingerprinted, searched, and locked in a holding cell against his will.

83.     Cameron's mugshot was taken and permanently released into the public domain.

84.     Though Cameron had no prior criminal history and was not a flight risk, his bond was set at $10,000. He paid a $1,000 nonrefundable fee to earn his release from custody.

85.     As a condition of his release, Cameron's movement was restricted. Cameron was completely prohibited from traveling internationally and was barred from traveling outside of Illinois without advance leave of court. As a result, his ability to freely travel within the United States was placed entirely at the mercy of the judge assigned to his case. Prior to his arrest, Cameron had traveled outside of Illinois often. In 2022, he traveled to France, the Netherlands, Japan, and California. Because of his release conditions, Cameron spent all of 2023 and most of 2024 forcibly confined to the State of Illinois.

**F. Officer Adolf knowingly gave false testimony to a McHenry County grand jury to secure a true bill and ensure that Cameron would be prosecuted.**

86.     Adolf appeared before a McHenry County grand jury and knowingly gave false testimony by stating that Cameron had reneged on a promise to come down to the police station for questioning.

87.     Cameron had never promised Adolf he would meet with police for questioning.

88.     Cameron had never even spoken to Adolf or anyone else from the Lakemoor Police Department.

14

89.     Cameron's attorney had drafted and emailed a statement to Adolf explicitly informing Adolf that Cameron would *not* be answering any questions from police.

90.     Although the indictment correctly stated that Cameron had issued the check "on or about September 23, 2022," the evidence presented to the grand jury erroneously presumed that Cameron had issued the check on September 26, 2022. The grand jury returned a true bill charging that Cameron had issued a bad check on September 23, 2022 based on Adolf's false testimony and "evidence" that Cameron had issued the check on September 26, 2022.

91.     Additionally, although "intent to defraud" was an element of felony deceptive practices in Illinois, the April 5, 2023 indictment did not allege that Cameron had possessed an "intent to defraud" when he had issued the check.

92.     On information and belief, the grand jury never even considered any evidence of an "intent to defraud."

93.     On April 14, 2023, Cameron was arraigned and pled not guilty to one count of felony deceptive practices.

94.     Cameron was prosecuted for nearly eighteen months. During that time, although Cameron was certain of his innocence, he experienced intense anxiety due to the fear that he would be found guilty of a crime that he had not committed. Cameron remained apprehensive that Reyes and Adolf would fabricate additional evidence and falsely testify to secure a guilty verdict at trial.

95.     Cameron was constantly plagued by worry that friends and family might encounter his mugshot online and discover his felony case.

96.     Cameron experienced the shame of stigmatization when a potential employer rejected him from a photography job solely because a background check revealed his pending felony charge.

15

97. While the prosecution was ongoing, the ASA in charge of Cameron's case told Cameron's criminal defense attorney and Reyes's civil attorney to "work the matter out amongst [them]selves." In other words, the ASA communicated that Cameron's criminal case would proceed unless Cameron successfully negotiated a civil settlement with Reyes.

98. Cameron submitted multiple good-faith offers through his attorney, but Reyes refused to accept anything less than the full amount of the disputed invoice.

99. On August 21, 2024, the eve of the pretrial conference, Cameron was faced with the choice of mounting an expensive and stressful defense at trial or giving in to Reyes's demands and issuing a check for the full amount of the disputed invoice. Cameron's criminal defense attorney advised him to pay the disputed bill. While refusing Reyes's bold offer of a mutual release, Cameron issued a cashier's check for $10,322.24 to SDR Garage.

100. The next morning, a *nolle prosequi* was entered on Cameron's lone felony charge. During the case's August 22, 2024 pretrial conference, ASA Tyler Mikan stated on the record that the dismissal of Cameron's charge was "with prejudice."

### COUNT I
### 42 U.S.C. § 1983: Fourth Amendment
### Unreasonable Seizure
### (Regan v. Adolf)

101. Plaintiff Cameron L. Regan realleges ¶¶ 1-100 as if fully alleged herein.

102. Adolf filed a criminal complaint while knowing that Cameron's PNC checking account had contained sufficient funds when Cameron had issued the $10,322.24 check.

103. Adolf knew or should have known additional exculpatory information, stated with particularity in ¶ 78, based on the concurrence of Cameron's attorney and Reyes.

104. An objectively reasonable police officer would not have believed that Cameron had committed the crime of felony deceptive practices.

16

105. An objectively reasonable police officer would have realized that the matter was a civil dispute between a mechanic and a customer over an automotive repair contract.

106. An objectively reasonable police officer would not have filed a criminal complaint on February 15, 2023 alleging that Cameron had committed a felony.

107. Adolf's decision to file a criminal complaint against Cameron was not motivated by a desire to bring a suspected criminal to justice.

108. Rather, his decision was primarily motivated by an improper desire to help a member of Lakemoor's business community recover a debt that was allegedly owed.

109. As a direct and proximate result of Adolf's decision to fabricate evidence and file a criminal complaint sans probable cause, Cameron was arrested, indicted, and spent the next eighteen months forcibly confined to the State of Illinois while awaiting trial.

110. During that time, the State compelled Cameron's attendance at thirteen hearings. Many of those appearances were in person, necessitating a three hour round-trip drive from Chicago to Woodstock, Illinois.

111. Cameron's criminal case ended without a conviction on August 22, 2024.

112. Adolf acted with a deliberate indifference for Cameron's constitutional right of freedom from unreasonable seizure.

**WHEREFORE,** Plaintiff Cameron L. Regan respectfully requests that this Court enter judgment in his favor and against Defendant Christopher F. Adolf:

(a) awarding damages to compensate for, *inter alia*, emotional harm, reputational harm, pain and suffering, loss of income, and the cost of his criminal defense;

(b) awarding punitive damages to deter future harmful behavior;

(c) awarding litigation expenses, court costs, and prejudgment interest;

(d) granting any other relief this Court deems just under the circumstances.

<u>COUNT II</u>
**42 U.S.C. § 1983: Fourteenth Amendment**
**Fabrication of Evidence**
**(Regan v. Adolf)**

113.    Plaintiff Cameron L. Regan realleges ¶¶ 1-100 as if fully alleged herein.

114.    Officer Adolf was the official in charge of investigating Reyes's allegation that Cameron had written SDR Garage a "bad check."

115.    Adolf had multiple sources of information at his disposal, including subpoenaed bank records, Reyes's report, and Cameron's attorney's statement. All of those sources were in agreement that Cameron's check had been issued to SDR Garage on September 23, 2022.

116.    Adolf knew that the check had been issued around 2:50 PM on September 23, 2022.

117.    Adolf possessed no information whatsoever suggesting that the check had been issued on September 26, 2022.

118.    Adolf knowingly fabricated inculpatory evidence by falsely asserting that Cameron had issued the check on September 26, 2022.

119.    Adolf then fabricated that Cameron's balance had been $164.51 at the moment of the check's issuance.

120.    Adolf communicated the fabricated information to ASA Maria Marek and ASA Sophia Dinkel in the McHenry County State's Attorney's Office.

121.    The information that Adolf fabricated was material and was likely to influence a prosecutor's determination of whether Cameron had committed felony deceptive practices.

122.    Adolf's fabricated version of events created the false appearance that Cameron had fraudulently withdrawn all but $164.51 from his PNC checking account as preparation for passing an insufficient check to SDR Garage.

18

123.    Adolf also knowingly omitted exculpatory information material to Cameron's case, with the intent of obtaining an arrest warrant from a McHenry County Judge and securing the approval of felony charges from the McHenry County State's Attorney's Office.

124.    As a direct and proximate result of Adolf's fabrication of inculpatory evidence and intentional omission of exculpatory evidence, Cameron was arrested, indicted, and spent the next eighteen months forcibly confined to the State of Illinois while awaiting trial.

125.    As a direct and proximate result of Adolf's fabrication of inculpatory evidence and intentional omission of exculpatory evidence, the course of negotiations with the McHenry County State's Attorney's Office was negatively altered—on the eve of the pretrial conference, Cameron was presented with a Hobson's choice between paying a disputed debt or encountering the stress, uncertainty, and considerable expense of a felony trial.

126.    Even though he was innocent, Cameron felt compelled to agree to ASA Mikan's offer and to pay the disputed debt because of Adolf's fabrication of evidence and prior willingness to give false testimony under oath.

127.    A reasonable officer in Adolf's position would have understood the clear unconstitutionality of fabricating inculpatory evidence and concealing exculpatory evidence.

128.    Adolf acted with a deliberate indifference for Cameron's constitutional right of freedom from deprivation of life, liberty, and property without due process of law.

    **WHEREFORE,** Plaintiff Cameron L. Regan respectfully requests that this Court enter judgment in his favor and against Defendant Christopher F. Adolf:

    (a) awarding damages to compensate for, *inter alia*, emotional harm, pain and suffering, loss of income, loss of enjoyment of life, and any other harm directly and proximately caused by the fabrication of inculpatory evidence;

    (b) awarding punitive damages to deter future harmful behavior;

    (c) awarding litigation expenses, court costs, and prejudgment interest;

(d) granting any other relief this Court deems just under the circumstances.

## COUNT III
### 42 U.S.C. § 1983: Fourth and Fourteenth Amendments
### Conspiracy to Deprive Constitutional Rights
### (Regan v. Adolf and Reyes)

129.     Plaintiff Cameron L. Regan realleges ¶¶ 1-100 as if fully alleged herein.

130.     On September 30, 2022, Reyes submitted a report to the Lakemoor Police Department alleging that Cameron had written SDR Garage a $10,322.24 "bad check."

131.     Reyes knew that if he pursued the alleged debt through a civil suit, Louis and Cameron would produce evidence of SDR Garage's material breach of contract.

132.     Officer Adolf was primarily motivated by a desire to help a member of Lakemoor's business community recover an alleged debt.

133.     On information and belief, Adolf and Reyes were also motivated by their shared animus toward homosexuals.

134.     At the time of Reyes's report, Adolf either knew or should have known that Cameron had not committed a criminal offense and that Reyes's version of events was inconsistent and contrary to common sense.

135.     On information and belief, Adolf remained deliberately indifferent to the implausibility of Reyes's version of events because he wanted to help Reyes and SDR Garage prevail in their civil dispute with Louis and Cameron.

136.     On information and belief, Adolf failed to record or document Reyes's report verbatim, so that the police report would rely solely on Adolf's claims about what Reyes had said. Adolf did this with the intent of filtering any statements that vitiated probable cause.

137.     Reyes admitted to Adolf that he had no reason to believe that Cameron had committed a criminal offense.

138.     Reyes knew that Cameron had not committed a criminal offense.

20

139.   Reyes admitted to Adolf that he ultimately just wanted to recover the alleged debt.

140.   Reyes knew, and Adolf either knew or had reason to know, that SDR Garage was not owed the full amount claimed.

141.   Reyes and Adolf agreed that they would use Adolf's authority and power as a police officer to coerce Louis and Cameron into paying a disputed debt to SDR Garage.

142.   Reyes and Adolf agreed that Adolf would arrest Cameron if it proved to be necessary to achieve the goal of recovering the $10,322.24 debt allegedly owed to SDR Garage.

143.   On information and belief, Adolf and Reyes also tacitly agreed to achieve their goal by perjury and fabrication of evidence, if necessary.

144.   Reyes willfully participated in joint activity with Adolf in an attempt to achieve his goal of pressuring Louis and Cameron into paying SDR Garage's $10,322.24 invoice.

145.   Reyes and Adolf both knew that Louis and Cameron were in a relationship, were co-owners of the Mazda, and were jointly responsible for any alleged debt to SDR Garage.

146.   Since Louis and Cameron were in a relationship, Reyes and Adolf both knew that threatening Cameron with arrest and prosecution could be an effective way to coerce Louis and Cameron into promptly paying the entire alleged debt.

147.   Reyes and Adolf agreed that Adolf would send Cameron a letter—on official Lakemoor Police Department letterhead—threatening to arrest Cameron if payment of $10,322.24 was not made to SDR Garage within seven business days.

148.   Reyes and Adolf agreed that Adolf would leave Cameron a voicemail identifying himself as a police officer and notifying Cameron that he would be arrested if payment of $10,322.24 was not made to SDR Garage within seven business days.

149.   On October 5, 2022, Adolf told Reyes that he would continue the criminal case against Cameron until Reyes had received the "satisfaction" of payment of the entire debt.

150. Adolf stayed true to his word—once Louis and Cameron refused to give in to Adolf's demands, Adolf continued his case against Cameron despite his discovery that Cameron's PNC checking account had been sufficient when the check had been issued.

151. Adolf instructed Reyes not to accept partial payment on the alleged debt, or else Adolf would be forced to treat the case as a civil matter.

152. Reyes followed Adolf's instruction and ceased all efforts to negotiate with Louis and Cameron for a partial payment in settlement of the debt.

153. On information and belief, Adolf directed Reyes to attempt to cash Cameron's check a second time, even though he knew that Cameron had told Reyes not to cash the check.

154. Reyes subsequently attempted to cash the check a second time on October 20, 2022, and it was returned marked "stop payment."

155. In early December 2022, Adolf gave Reyes full control over whether the criminal investigation of Cameron would continue. Once the investigation continued, Adolf directed Reyes to cease SDR Garage's civil collection efforts.

156. On information and belief, Reyes and Adolf agreed that they would conceal facts conclusively showing that the matter was a civil dispute, with the intent of convincing the McHenry County State's Attorney's Office to file charges against Cameron.

157. As soon as Reyes and Adolf had enough time to talk things over, Reyes altered his version of events to be more consistent with the fabricated, inculpatory version that Adolf presented to the McHenry County State's Attorney's Office.

158. On February 15, 2023, Adolf called Reyes to inform him that a warrant had been issued for Cameron's arrest. Reyes thanked Adolf for his help.

159. As a direct and proximate result of Reyes's and Adolf's false statements and omissions, Cameron was arrested, indicted, and prosecuted for nearly eighteen months.

160.    During those eighteen months, even though Reyes knew that Cameron had not committed a crime, he intentionally withheld exculpatory knowledge from prosecutors.

161.    Reyes acted with a clear goal: to use Cameron's freedom as leverage to force Louis and Cameron to submit to SDR Garage's unjustified demand of $10,322.24.

162.    Reyes's persistence ensured that Adolf's efforts were not in vain. Four days before trial, Louis and Cameron reluctantly paid Reyes's demand.

WHEREFORE, Plaintiff Cameron L. Regan respectfully requests that this Court enter judgment in his favor and against Defendants Christopher F. Adolf and Francis Joseph Y. Reyes:

(a) declaring that Christopher F. Adolf and Francis Joseph Y. Reyes are jointly liable for all tortious acts committed by either party in furtherance of the conspiracy to deprive Cameron L. Regan of his constitutional rights;

(b) granting any other relief this Court deems just under the circumstances.

### COUNT IV
#### 42 U.S.C. § 1983: Fourth and Fourteenth Amendments
#### Unconstitutional Policy and Custom ("*Monell* Liability")
#### (Regan v. Village of Lakemoor)

163.    Plaintiff Cameron L. Regan realleges ¶¶ 1-100 as if fully alleged herein.

164.    Lakemoor, given its modest population of 6,000, has a relatively extensive record of deliberate indifference toward the constitutional rights of the accused during the 15-year period that administrator Ryan "Todd" Weihofen has retained final policymaking authority.

165.    The Village has shown a pattern of responding severely toward any alleged theft—no matter how minor—from Lakemoor businesses, with no regard for the rights of suspects.

166.    The Village's Retail Theft Ordinance contains a clause that creates a mandatory presumption of guilt. It states, "if any person removes merchandise beyond the last know [*sic*] station for receiving payments for that merchandise in that retail mercantile

23

establishment, such person shall be presumed to have possessed, carried away or transferred such merchandise with the possession, use or benefit of such merchandise."

167.    Mandatory presumption clauses have repeatedly been held unconstitutional in Illinois and United States courts. A reasonable policymaker would have known that such a presumption violates a defendant's constitutional right to due process of law.

168.    Lakemoor administrator Weihofen, the policymaker behind the Village's retail theft policy, also presides at the Village's hearings and determines the guilt of defendants by a preponderance of the evidence.

169.    Lakemoor criminal defendants charged with retail theft are not just denied due process: once they are (nearly inevitably) found guilty—and sometimes before they are found guilty—they face punishment grossly disproportionate to the petty crime.

170.    On its website, the Village proudly proclaims that its "no trespassing" retail theft policy is the "first of its kind." The policy permits Lakemoor businesses to collude—with the Village's blessing and assistance—to ban suspected petty thieves from their premises.

171.    The Village has a practice of directly lobbying Lakemoor businesses to join the novel "no trespassing" pact. To date, 43 businesses have joined the program, including a dental office, nail salon, and almost all of the businesses in the Village's main shopping center.

172.    Village administrator Weihofen stated in an interview with local news that the Village was "trying to make [its theft policy] tough." He noted that minimum fines for petty theft "would be set at the maximum" and added, "If you steal at one store in Lakemoor, you may lose the privilege of shopping at other stores in Lakemoor."

173.    The program's sole purpose is disproportionate retaliation. Many of the businesses on the list, like Lakemoor Dental, have no rational connection to retail theft whatsoever.

174. The Village also has a policy of publicly shaming individuals who are charged with violating its retail theft ordinance—even if they have not been found guilty—by permanently posting links to their mugshots on the front page of the Village's website.

175. For example, the Village posted the mugshot of 64-year-old Dean C. Cardella on their official website after he had allegedly stolen donuts and a loaf of bread valued at $6.68. Mr. Cardella was handed a one-year no trespass order banning him from all 43 businesses participating in the Village's retail theft program. On information and belief, Mr. Cardella was also fined $500 for the $6.68 theft.

176. Like its retail theft program, the Village's "bad check" program has been designed to favor businesses while remaining deliberately indifferent toward the rights of the accused.

177. The Village's "bad check" program weaponizes the threat of criminal prosecution and the authority of the police to assist in the recovery of dishonored checks for businesses.

178. Whenever a business reports that it has received a dishonored check, the Village has a custom of mailing a "Lakemoor Bad Check Letter" to the alleged issuer of the check.

179. The Village has a custom of mailing a "Lakemoor Bad Check Letter" before conducting any meaningful investigation into the criminal or civil nature of a dishonored check, even when that check is marked "stop payment."

180. The Village has a custom of coercing the payment of money to complainants, even when the complainant states that their only motivation is payment of an alleged debt.

181. The Village has a custom of threatening each recipient of the "Lakemoor Bad Check Letter" with "embarrassment," "inconvenience," and "arrest," unless his or her entire alleged debt is repaid to the complainant in question within seven business days.

182. The Village has a custom of faultily assuming that an alleged violation of 720 ILCS 5/17-1(B)(1) is subject to the same seven-day payment period as 720 ILCS 5/17-1(B)(2).

183.    The Village has a custom of presuming that all dishonored checks issued by individuals are done so with an "intent to defraud."

184.    Over the past ten years, the Lakemoor Police Department has investigated 22 incidents of deceptive practices. Only one of those cases—a dishonored check written by a business—ended with a conclusion that the matter was civil. The suspects in all of the other cases were individuals. In each of those cases, Lakemoor Police concluded that the matter either was criminal or would "become criminal" if the debt was not paid promptly.

185.    The Village has engaged in a pattern of forwarding civil disputes to the McHenry and Lake County State's Attorney's Offices, even when no checks have been dishonored.

186.    The Village has a custom of treating alleged breaches of contract as crimes.

187.    For example, in one report, a complainant asked Lakemoor Police to intervene in a civil dispute after poor weather delayed concrete work on his home. The complainant told police that he wanted a refund of his $2,100 deposit due to the unexpected delay. The suspect had obtained a work permit for the job, and the job had genuinely been delayed due to poor weather. Regardless, Lakemoor Police Officer Francke inserted himself in the civil matter by advising the complainant to "call [the suspect] and tell him that unless he calls back within the next five minutes he would go to the police." When the suspect failed to appease the complainant, Officer Francke forwarded the case to the Lake County State's Attorney's Office. Unsurprisingly, Lake County prosecutors declined to take the case.

188.    A reasonable policymaker would have known that the Village's custom of intervening in civil disputes and treating breaches of contract as crimes could foreseeably result in someone being criminally charged after being accused of breaching a contract.

189.    A reasonable policymaker would have known that withholding payment due to a bona fide dispute over the quality of a service does not constitute a criminal offense.

190. A reasonable policymaker would have known that the Village's "bad check" policy, as enforced, could foreseeably result in the wrongful arrest of an individual who withholds payment due to a civil dispute over the quality of service or the truthfulness of a merchant.

191. The Village's bad check policy was a moving force behind Officer Adolf's use of the criminal justice system to attempt to coerce Cameron to pay a disputed debt.

192. The Village's custom of improperly presuming the guilt of the accused, as evidenced by their retail theft "mandatory presumption" policy and their deceptive practice investigations, was a moving force behind Adolf's initial presumption of Cameron's guilt.

193. The Village's pattern and policy of acting in concert with local businesses to punish accused individuals was a moving force behind Officer Adolf's decision to act in concert with Reyes and SDR Garage to attempt to force Cameron to pay a disputed debt to SDR Garage.

194. The Village's pattern and policy of publicly shaming individuals suspected of criminal behavior was a moving force behind Officer Adolf's decisions to threaten to arrest and to ultimately arrest Cameron because of his refusal to pay a disputed debt.

195. The Village's pattern of meddling in civil matters with no regard for the rights of alleged debtors was a moving force behind Officer Adolf's decision to forge ahead with a criminal complaint despite knowing that, at worst, Cameron had refused to pay a debt.

196. The Village's pattern of referring civil disputes to prosecutors was a moving force behind Adolf's decision to forward Cameron's case to McHenry County prosecutors.

197. As a direct and proximate result of the Village's policies and customs, Cameron's constitutional rights were violated and he suffered harm, as stated above with specificity.

**WHEREFORE,** Plaintiff Cameron L. Regan respectfully requests that this Court enter judgment in his favor and against Defendant Village of Lakemoor:

    (a) awarding compensatory damages, in an amount to be determined at trial;

    (b) awarding punitive damages to deter future harmful behavior;

(c)  awarding litigation expenses, court costs, and prejudgment interest;

(d)  granting any other relief this Court deems just under the circumstances.

### COUNT V
### Abuse of Process
### (Regan and Impagliazzo v. Reyes and SDR Garage Inc.)

198.   Plaintiffs restate and reallege ¶¶ 1-100 as if fully stated and alleged herein.

199.   After Louis and Cameron refused to pay a disputed repair bill, Reyes contacted the

Lakemoor Police Department on September 30, 2022 to report that Louis and Cameron had

not paid SDR Garage's invoice and that Cameron had written SDR Garage a "bad check."

200.   Reyes omitted material facts, stated with particularity in ¶ 46, with the intent of

misleading police and prosecutors into believing that probable cause existed to charge

Cameron with felony deceptive practices.

201.   Reyes knew that Cameron had not committed a crime and that there was an

ongoing, genuine dispute over the quality, effectiveness, and cost of SDR Garage's repairs.

202.   Reyes's motivation was not the pursuit of justice against a suspected criminal. His

goal was to gain an advantage in his and SDR Garage's dispute with Louis and Cameron.

203.   Reyes knew that Louis and Cameron were in a relationship and that prosecuting

Cameron could serve as effective leverage to coerce them into paying SDR Garage's invoice.

204.   Reyes intended to use the continuation of Cameron's criminal prosecution as

leverage to extort an unjust sum from Louis and Cameron.

205.   After Cameron was indicted pursuant to legal process, Reyes took a much more

active, powerful role in Cameron's prosecution than a typical complaining witness.

206.   The ASA in charge of Cameron's case gave Reyes and his civil attorney *de facto* veto

power over any decision to dismiss Cameron's criminal charge.

207.   Although the ASA acknowledged to Cameron's attorney that the case against

Cameron was "extremely weak," he refused to dismiss the case unless Reyes consented.

208.    ASA Mikan told Cameron's criminal defense attorney and Reyes's civil attorney, Guy Youman, to "work the matter out amongst [them]selves." In other words, the prosecutor communicated that the felony case would proceed unless Louis and Cameron successfully negotiated a civil settlement with Reyes and Mr. Youman.

209.    Compelled by the threat of continued prosecution, Cameron made multiple good-faith offers through his attorney, but Mr. Youman rejected them, called them "insulting," and represented that Reyes would not accept much less than the full amount of the invoice.

210.    Reyes subsequently stated that he would continue Cameron's criminal prosecution unless Cameron paid the full amount demanded.

211.    For eighteen months, Reyes refused to consent to dismissal of the criminal charge.

212.    As stated earlier with particularity, Cameron suffered emotionally, physically, and financially as a direct and proximate result of Reyes's continuation of the felony case.

213.    As a direct and proximate result of Reyes's misuse of Cameron's criminal prosecution, Louis and Cameron were also deprived of the use and enjoyment of their Mazda from February 2023 until August 2024. Since the Mazda was evidence in a criminal proceeding, Louis and Cameron were barred from engaging in any act of spoliation.

214.    As a direct and proximate result of Reyes's misuse of the criminal process, Louis and Cameron ultimately paid SDR Garage $10,322.24—a sum that neither Reyes nor SDR Garage were entitled to—because the expense of a felony trial would have been far greater.

215.    Mr. Youman admitted to Cameron's defense attorney that he was apprehensive that "once the criminal case is over, Cameron will just turn around and sue Francis [Reyes]."

216.    Once Louis and Cameron had acceded to Reyes's demands for $10,322.24, Reyes's attorney, Mr. Youman, shamelessly attempted to convince Cameron to agree to release Reyes and SDR Garage from civil liability as a condition of dismissal of the criminal case.

217.    As soon as SDR Garage received the $10,322.24 cashier's check, Cameron's case was quickly and unceremoniously dismissed with prejudice—unsurprisingly so, since the criminal case no longer served any purpose once Reyes received the money he had sought.

    **WHEREFORE,** Plaintiffs Cameron L. Regan and Louis Impagliazzo respectfully request that this Court enter judgment in their favor and against Defendants Francis Joseph Y. Reyes and SDR Garage Inc.:

    (a) awarding compensatory damages, in an amount to be determined at trial;

    (b) awarding punitive damages to deter future harmful behavior;

    (c) awarding litigation expenses, court costs, and prejudgment interest;

    (d) granting any other relief this Court deems just under the circumstances.

## COUNT VI
### Intentional Infliction of Emotional Distress
### (Regan and Impagliazzo v. Reyes and SDR Garage Inc.)

218.    Plaintiffs restate and reallege ¶¶ 1-100 as if fully stated and alleged herein.

219.    Acting as agent for SDR Garage, Reyes threatened Louis and Cameron with arrest and prosecution for "theft" unless they promptly paid a sum that he knew they did not owe.

220.    Then, Reyes filed a false police report with the intent of having Louis and Cameron charged with crimes that he knew they had not committed.

221.    Once Cameron had been arrested and charged with felony deceptive practices, Louis remained mindful of Reyes's threats of arrest and feared that, unless he paid SDR Garage's bill, he would be next. Based on Reyes's threats, Louis believed he would be charged as an accomplice solely based on his presence at SDR Garage's shop on September 23, 2022.

222.    Reyes's threats were made with the intent to incite fear in Louis and Cameron so that they would hand over $10,322.24 to SDR Garage.

223.    Reyes's behavior was extreme and outrageous. Making false felony accusations and threatening additional prosecution with the intent of extorting money from a victim is behavior that is utterly intolerable in a civilized society.

224.    Reyes intended to inflict emotional distress upon Louis and Cameron so that they would capitulate to his extortion and pay SDR Garage money that it was not owed.

225.    For nearly two years, Louis and Cameron lived in a constant state of severe emotional distress. Cameron suffered with anxiety and depression caused by Reyes's threats and actions. Louis remained in a state of extreme anxiety and fear that Reyes would follow through on his threat to prosecute him as well.

226.    Reyes's behavior was not an isolated incident—it was a campaign of extortion characterized by repeated demands for $10,322.24 while Cameron's prosecution continued.

WHEREFORE, Plaintiffs Cameron L. Regan and Louis Impagliazzo respectfully request that this Court enter judgment in their favor and against Defendants Francis Joseph Y. Reyes and SDR Garage Inc.:

(a) awarding compensatory damages, in an amount to be determined at trial;

(b) awarding punitive damages to deter future harmful behavior;

(c) awarding litigation expenses, court costs, and prejudgment interest;

(d) granting any other relief this Court deems just under the circumstances.

## COUNT VII
### Intentional Infliction of Emotional Distress
### (Regan v. Adolf)

227.    Plaintiff Cameron L. Regan realleges ¶¶ 1-100 as if fully alleged herein.

228.    Adolf threatened to embarrass and arrest Cameron unless he paid an alleged debt to SDR Garage within seven business days.

229. Once Cameron refused to pay the alleged debt, Adolf fabricated inculpatory evidence that created the appearance of probable cause. Adolf then used that inculpatory evidence to obtain an arrest warrant and a felony indictment.

230. Officer Adolf knew that threatening Cameron with arrest to attempt to settle a civil dispute was not a legitimate use of his power and authority as a police officer.

231. Adolf knew that there was a high probability that threatening and wrongfully arresting Cameron would cause Cameron severe emotional distress.

232. Adolf's behavior was extreme and outrageous. Threatening to embarrass and arrest someone unless he or she pays a disputed sum of money is intolerable in a civilized society. Fabricating evidence so that a victim is arrested, charged with a felony, and prosecuted for eighteen months is an order of magnitude more intolerable in a civilized society.

**WHEREFORE,** Plaintiff Cameron L. Regan respectfully requests that this Court enter judgment in his favor and against Defendant Christopher F. Adolf:

(a) awarding compensatory damages, in an amount to be determined at trial;

(b) awarding punitive damages to deter future harmful behavior;

(c) awarding litigation expenses, court costs, and prejudgment interest;

(d) granting any other relief this Court deems just under the circumstances.

## COUNT VIII
### Civil Conspiracy
### (Regan and Impagliazzo v. Adolf and Reyes)

233. Plaintiffs reallege ¶¶ 1-100, 130-162, 219-226 as if fully alleged herein.

234. Adolf and Reyes reached an understanding that they would act in concert to achieve an unlawful goal by unlawful means.

235. In furtherance of achieving their goal of coercing payment of $10,322.24 to SDR Garage, Reyes intentionally inflicted emotional distress upon Louis and Cameron by threatening them with arrest and prosecution.

236.    In furtherance of achieving their goal of coercing payment of $10,322.24 to SDR Garage, Adolf intentionally inflicted emotional distress upon Cameron by threatening to embarrass him, arresting him, fabricating evidence, and maliciously prosecuting him.

237.    In furtherance of achieving their goal of coercing payment of $10,322.24 to SDR Garage, Reyes abused the criminal process by misleading prosecutors, demanding that Cameron's prosecution continue until he received the money he desired, and harassing Cameron with repeated demands for civil settlement.

238.    Louis and Cameron were both damaged by experiencing severe emotional distress and forfeiting the $10,322.24 that they jointly possessed.

**WHEREFORE,** Plaintiffs Cameron L. Regan and Louis Impagliazzo respectfully request that this Court enter judgment in their favor and against Defendants Christopher F. Adolf and Francis Joseph Y. Reyes:

(a) declaring that Christopher F. Adolf and Francis Joseph Y. Reyes are jointly liable for all tortious acts committed by either party in furtherance of the conspiracy;

(b) granting any other relief this Court deems just under the circumstances.

<u>**COUNT IX**</u>
**745 ILCS 10/9-102: Indemnification**
**(Regan and Impagliazzo v. Village of Lakemoor)**

239.    Plaintiffs restate and reallege ¶¶ 1-100 as if fully stated and alleged herein.

240.    The Village was the employer of Officer Adolf during the relevant period of September 2022 through August 2024.

241.    Officer Adolf committed the tortious acts alleged above under color of law and within the scope of his employment as an officer with the Lakemoor Police Department.

**WHEREFORE,** Plaintiffs Cameron L. Regan and Louis Impagliazzo respectfully request that this Court enter judgment in their favor and against Defendant Village of Lakemoor:

(a) finding that Village of Lakemoor is liable for any judgment of compensatory damages entered against Christopher F. Adolf;

(b) granting any other relief this Court deems just under the circumstances.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

/s/ *Louis Impagliazzo*
Louis Impagliazzo
1837 South Canalport Avenue
Chicago, Illinois 60616
impagliazzo@uchicago.edu
+1 (415) 969-9993

/s/ *Cameron Regan*
Cameron Regan
1837 South Canalport Avenue
Chicago, Illinois 60616
regan@windypixel.com
+1 (312) 975-5776